**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0620n.06

No. 10-3019

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

**Sep 17, 2010**

LEONARD GREEN, Clerk

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff-Appellee,** ) | |
| ) | |
| **v.** ) | **ON APPEAL FROM THE UNITED** |
| ) | **STATES DISTRICT COURT FOR THE** |
| **KENNETH KEISEL,** ) | **SOUTHERN DISTRICT OF OHIO** |
| ) | |
| **Defendant-Appellant.** ) | |
| ) | |
| ) | |

**Before: GIBBONS and COOK, Circuit Judges; and VAN TATENHOVE, District Judge.**[*]

**JULIA SMITH GIBBONS, Circuit Judge.** Defendant-appellant Kenneth Keisel appeals the district court's revocation of supervised release and imposition of a twelve-month sentence following Keisel's admitted violation of two conditions of supervised release. With respect to the decision to revoke supervised release, Keisel challenges the district court's consideration of facts that he claims were not disclosed to him prior to the revocation hearing and not discussed in the probation office's Supervised Release Violation Report ("SRV Report"). He also challenges the district court's consideration of Keisel's need for psychiatric treatment in its revocation decision. Finally, Keisel challenges both the procedural and substantive reasonableness of his sentence.

For the following reasons, we affirm the district court's revocation of supervised release and the sentence imposed.

---

[*]The Honorable Gregory F. Van Tatenhove, United States District Judge for the Eastern District of Kentucky, sitting by designation.

I.

On June 27, 2006, Kenneth Keisel was sentenced to twenty-four months of incarceration and a thirty-six-month term of supervised release after entering a plea of guilty to one count of possession of child pornography in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2). After serving the time in custody, Keisel began his period of supervised release on May 23, 2008.

On December 4, 2009, Probation Officer Boone filed a Petition for Warrant or Summons requesting a show-cause hearing, alleging that Keisel had violated two terms of his supervised release. First, the petition alleged that Keisel had violated the mandatory condition prohibiting the commission of "another Federal, state, or local crime." According to the petition, on September 1, 2009, Keisel pled guilty to reckless operation of a motor vehicle in Franklin County Municipal Court and was fined $350.67. Second, the petition alleged that Keisel violated the standard condition prohibiting his leaving the judicial district without permission by traveling to Michigan to appear before a judge regarding the filing for a protective order against him by his ex-wife.

At the show-cause hearing held January 7, 2010, Keisel admitted to both violations. According to Keisel's attorney, Keisel "commit[ted] a traffic offense of reckless operation . . . [and] travel[ed] outside of the district on July 7th of 2009." Each of these violations was categorized as a grade C violation. With respect to the reckless operation offense, the SRV Report detailed that Keisel was identified as the driver of an at-fault vehicle in a crash who fled the scene. The victim of the crash and a witness followed the suspected vehicle, a red 1994 Subaru with the Ohio vanity license plate "Han Solo," until it parked. Both the victim and witness then individually called the police with the same description of the vehicle and license plate—details that matched those of

2

Keisel's car. Police contacted Keisel, who denied that he was driving the car at the time of the crash. In a later photo lineup, however, the victim and witness correctly identified Keisel as the driver at the time the accident occurred. At the revocation hearing, when asked by the district court to explain the circumstances of the offenses, Keisel stated that he had been wrongly accused in the reckless driving incident. Though he pled guilty to the charge, Keisel explained that he was someplace else when the accident involving his vehicle occurred and only pled guilty to "avoid trial."

With respect to his unauthorized trip to Michigan, Keisel told the court that he knew that he was not permitted to leave the jurisdiction without permission, but that he had traveled in order to answer a court summons. The court then described the alleged circumstances regarding the Michigan protection hearing, in which Keisel's ex-wife, Sara Jo Ter Beek, sought a protective order against him. Keisel had allegedly harassed Ter Beek on several separate occasions, including once at a science-fiction convention in Lansing, Michigan, on May 24, 2009. Keisel admitted that he engaged in an unauthorized trip to Michigan on that date in order to attend the convention but denied that he had verbally or physically intimidated his ex-wife. With respect to his appearance before the Michigan court, Keisel stated that the court had ultimately denied Ter Beek's motion for a protective order but granted her a no-contact order in light of Keisel's stated plan to move near Ter Beek's residence in Michigan.

At the revocation hearing, the district court also inquired about the circumstances surrounding the submission of a letter, purportedly from Keisel's counsel and allegedly created by Keisel himself, to the probation office. According to the SRV Report, on October 22, 2009, Keisel dropped off a letter at the probation office indicating that it was from his attorney of record, George

Wolfe. The letter requested information regarding the number of times Keisel was approved for travel and information on the procedures for transferring a supervision case. Several days later, Boone questioned Keisel about the letter. Keisel revealed that it was not Wolfe who prepared the letter, but someone else at Wolfe's law office. Boone later discerned from Wolfe that the letter had not been prepared by his office. At the revocation hearing, Boone and Wolfe confirmed these factual details for the court. Keisel, however, denied that he had presented the letter as anything other than his own but agreed that anyone who looked at it would think that it came from his lawyer's office.

The district court then heard briefly from Boone regarding the results of a polygraph test, taken three days prior, regarding Keisel's sex-offender treatment. Boone indicated that Keisel passed the test, but that there were two areas of concern: Keisel's alcohol use and his sexual relations with another female. When asked for his recommendation in regard to an appropriate response to this information, Boone stated that further investigation was necessary, and asked that the court "allow [him] access to [Keisel's] financial information while he is under supervision."

Finally, during the course of the hearing, the court heard from both counsel regarding sentencing. At the start of the hearing, Keisel's attorney argued that the violations were "not really serious" and that they should be balanced against the rest of Keisel's performance on supervised release. Keisel's attorney then described Keisel's "long struggle to get a job" because of his sex-offender and felon status, his current employment as a car salesman, his positive contact with his son, and his progress and participation in sex-offender treatment. He then noted that, because "there are violations[,] . . . some sanction is appropriate," but recommended something short of confinement to a halfway house, such as home confinement or tighter reporting requirements. At

the end of the hearing, the government argued for, at a minimum, "a period of supervision or a period of incarceration" in a halfway house for a period of at least sixty days, "if not actual revocation and a prison sentence and a new term of supervised release." The government cited Keisel's lack of truthfulness before the court, the circumstances regarding his alleged harassment of his ex-wife, and his "lack of good adjustment to supervised release." The district court then gave Keisel's counsel another opportunity to speak regarding sentencing, but counsel relied "on [his] earlier opportunity to be heard."

After taking a recess to speak to Boone regarding possible conditions that might be imposed on Keisel, the district court addressed revocation and sentencing. The district court first stated that it was "concerned about the nature of the violations and the implications of these violations . . . [and] deeply concerned about the differences in the versions given by Mr. Keisel and others about the circumstances surrounding these violations." The court gave Keisel an opportunity to speak. In a brief statement, Keisel said that he had attended all of the meetings required by Boone and had kept him apprised of everything, including the reckless driving incident. He also stated that, despite submitting his travel requests weeks in advance, none of his requests had been approved.

The district court then addressed its rationale for revoking Keisel's supervised release and imposing a new sentence:

> [I]t is quite clear that Mr. Keisel has left the jurisdiction without permission[, and] he knows that's improper[,] . . . illegal[,] . . . [and] a violation of his supervised release. He has done it twice that we know of . . . . His conduct in that regard indicates that his actions . . . are unpredictable, and the Court had no assurances of where he is at any given time because he, obviously, does not consider those restrictions binding on him. . . .

5

The discrepancies in the testimony about what happened at the time of these two violations concerns the Court. . . . [A]nd Mr. Keisel's credibility is at issue here, and I find his credibility lacking. . . . [T]his document[,] . . . which purports to have been issued by the Wolfe Law Offices to Mr. Boone[,] . . . has every appearance of coming from a law office. And Mr. Boone has told the Court that, in fact, that is how it was represented to him by Mr. Keisel. Mr. Keisel says, quite to the contrary, [that] he told Mr. Boone that he prepared it himself, and I don't believe him. And when I reach that conclusion, that gives me great concern as to why Mr. Keisel is making up these stories.

When I look at the circumstances surrounding the reckless driving offense, which he pled guilty to, and I see the folks who were victims of that offense saying that they followed the driver of the car all of the way downtown to Goodale Park. They couldn't have been mistaken about that car. It has a distinctive license plate, Han Solo. There can't be more than one of those.

The information that I have indicates that they picked him out of a lineup. He says he wasn't even there, but on the other hand, he did, indeed, park his car there and go to the convention center, which is exactly what the people say they observed him do. I don't believe his story about that incident. And when I reach that conclusion, I, again, have to ask myself, why is he making up this story?

I look at the circumstances surrounding the interaction with the former wife in Michigan. Whatever happened, it was apparently of sufficient concern to her that she went to a court, and the court issued an order. And even after the hearing, the court has continued an order that says he is to have no contact with her.

It is obvious that Mr. Keisel intends to persist in his plan to move to Michigan, and he is willing to further that plan by creating a document that purports to come from a law office and deliver it to his Probation Officer. This is disturbing and bizarre behavior, and it gives the Court serious concerns about Mr. Keisel's mental stability and the possibility that he has—that he is living in a world that is not real in his mind.

I am going to revoke his supervised release, and I am going to sentence him to one year of incarceration. I am going to recommend . . . that he be assigned to a federal correctional institution that has all of the facilities to do a thorough evaluation of his psychiatric condition. I am choosing a sentence that is slightly in excess of the guidelines in this case—the high end of the guideline would be ten months[1]—but I

---

[1]As noted in the SRV Report, and pursuant to U.S.S.G. § 7B1.4, Keisel's criminal history category of II, coupled with two grade C violations, resulted in a Guidelines range of four to ten

think it will probably take at least a year for a reliable psychiatric evaluation of Mr. Keisel. He, on the surface, is a very credible person when he wants to be, and he wants to be when he is answering the court's questions, but when he is interacting with other people like the police officer who investigated the accident or Mr. Boone . . . he is a different kind of person. He makes up stories, and he is not so nice.

So, I think it is going to take a while to get to the bottom of what is going on here. I am hoping that this sentence will be one that will be beneficial to Mr. Keisel himself, if, indeed, there is something going on here that should be addressed from a medical or psychiatric standpoint, that is going to be for his benefit as well as the benefit of the public.

I am going to include in my sentence an additional two-year term of supervised release with all of the same conditions that are included in his original term of supervised release.

When asked by the district court if he had "any legal impediments to the sentence that the court has just announced," Keisel's counsel replied: "No legal impediments. No objections." Keisel timely filed a notice of appeal.

## II.

Pursuant to 18 U.S.C. § 3583(e)(3), the district court may "revoke a term of supervised release, and require the defendant to serve in prison all or part of [that] term" if the court "finds by a preponderance of the evidence that the defendant violated a condition of supervised release." *See United States v. Cofield*, 233 F.3d 405, 406 (6th Cir. 2000). The United States Sentencing Guidelines further direct that "[u]pon a finding of a Grade C violation, the court may (A) revoke probation or supervised release; or (B) extend the term of probation or supervised release and/or modify the conditions of supervision." U.S.S.G. § 7B1.3(a)(2). We review a district court's decision to revoke supervised release for abuse of discretion. *United States v. Kontrol*, 554 F.3d

months incarceration.

1089, 1091 (6th Cir. 2009). "To reverse the [district] court's revocation order, we must have a 'definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached . . . ." *United States v. Thompson*, 314 F. App'x 797, 799 (6th Cir. 2008) (quoting *United States v. Stephenson*, 928 F.2d 728, 732 (6th Cir. 1991)). The district court's findings of fact are reviewed for clear error, and its legal conclusions are reviewed *de novo*. *Kontrol*, 554 F.3d at 1091.

At the revocation hearing, Keisel, through counsel, admitted to two grade C violations. First, he admitted to the commission of a local crime, namely the reckless operation of a motor vehicle. While Keisel personally argued that he had not actually been present at the time the accident occurred and had only pled guilty to avoid trial, the weight of the evidence indicated that Keisel had, in fact, been involved in the hit-and-run incident. The district court, for example, noted that there was evidence that the victim and witness followed Keisel's car from the scene of the accident, notified police when he parked, and later identified Keisel from a photographic lineup. Second, Keisel admitted that he twice left the jurisdiction without permission to travel to Michigan to engage in activity involving his ex-wife. During the first of these trips, Keisel traveled to Lansing, Michigan, to see Ter Beek at a science-fiction convention. That encounter, characterized by Ter Beek as "verbally abusive and physically intimidating," later resulted in her filing a motion for a protective order in Michigan. Keisel also admitted that he traveled to Michigan without authorization from the probation office to respond to the hearing summons on that motion. The Michigan court found Keisel's behavior abusive enough to warrant a no-contact order.

In light of these admissions, the district court rightly concluded by a preponderance of the evidence that Keisel had engaged in two grade-C violations of his supervised release. The district court, therefore, did not abuse its discretion in deciding to revoke supervised release pursuant to 18 U.S.C. § 3583(e)(3).

Keisel argues that the district court erred, however, in "relying on violations which were not part of the Petition for Summons, and which were not disclosed prior to the hearing." Keisel contends that the court relied on several factors in support of revocation, including the submission to the probation office of a letter created by Keisel that purported to be from his attorney, the results of a polygraph test, and the need for psychiatric help. He argues that because these factual allegations were not disclosed prior to the hearing, it was error for the district court to consider them in making a revocation decision.

This court has previously noted:

> A revocation hearing need not be as formal as trial proceedings, and a trial court can consider any relevant evidence, including hearsay, which bears upon the court's inquiry into whether the defendant has violated the terms and conditions of his . . . supervised release. . . . There is no legal restriction against the trial court's consideration of evidence relating to violations not specifically mentioned in the revocation petition as long as the defendant is given reasonable notice of those charges and has an opportunity at the hearing to rebut those charges.

*United States v. Mumford*, 2 F.3d 1152, 1993 WL 307086, at *2 (6th Cir. Aug. 12, 1993) (unpublished table opinion) (citing *Stephenson*, 928 F.2d at 732). Here, despite Keisel's attempt to characterize certain facts discussed at the hearing as new "violations," the district court permissibly considered all of the relevant facts and circumstances of Keisel's behavior on supervised release and

9

permitted Keisel to respond to and contest the characterization of all of the facts and evidence presented at the hearing.

With respect to the specific factual considerations challenged by Keisel, it should first be noted that Keisel *did* receive notice that the letter would be before the district court. That information was contained in the SRV Report, filed with the district court, and docketed one month prior to the revocation hearing. And, despite the probation officer's brief discussion of the results of Keisel's polygraph test, taken three days before the hearing, there is no evidence in the record that the district court relied upon that test in making its revocation determination. Rather, the record reflects that once the district court received a recommendation from Boone for further financial monitoring of Keisel during supervision, the court never mentioned the polygraph test again.

Finally, Keisel's claim that the district court abused its discretion by relying on its observations of his mental state in making its decision to revoke supervised release is likewise without merit. The decision to revoke supervised release and subsequent decision to impose a sentence are closely related, and the district court may consider a broad range of information with respect to both determinations. As noted above, the district court may consider "any relevant evidence . . . which bears upon the court's [revocation] inquiry." *Id*. at *2. And,

> [f]ar from confining the evidence sentencing courts may consider, Congress has insisted that the door remain wide open: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

*Kontrol*, 554 F.3d at 1094 (quoting 18 U.S.C. § 3661). The district court therefore did not err by considering Keisel's erratic behavior and demeanor in its revocation and sentencing decisionmaking.

Because Keisel admitted to two violations of the conditions of his supervised release, and the evidence in the record fully supports the court's finding that violations did occur, the district court did not abuse its discretion in revoking supervised release.

III.

We review a district court's sentencing determination following revocation of supervised release under the same deferential abuse-of-discretion standard applied to sentences following conviction. *Id.* at 1092; *United States v. Lapsins*, 570 F.3d 758, 772 (6th Cir. 2009). This inquiry has both a procedural and a substantive component. *Lapsins*, 570 F.3d at 772 (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)). "A sentence is procedurally unreasonable if the district court failed to calculate (or improperly calculated) the Guidelines range, treated the Guidelines as mandatory, failed to consider the § 3553(a) factors, selected a sentence based on clearly erroneous facts, or failed adequately to explain the chosen sentence." *Id.* (citing *Gall*, 552 U.S. at 51). Where, as here, the district court asks for objections after imposing the sentence, and the defendant fails to object, arguments relating to the procedural reasonableness of the sentence are reviewed for plain error. *United States v. Vonner*, 516 F.3d 382, 385 (6th Cir. 2008) (citing *United States v. Bostic*, 371 F.3d 865, 872–73 (6th Cir. 2004)). "Under this standard, a defendant must demonstrate that the district court's error was obvious or clear, affected his substantial rights, and affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Harmon*, 607 F.3d 233, 238 (6th Cir. 2010) (citing *United States v. Houston*, 529 F.3d 743, 750 (6th Cir. 2008)).

Keisel argues that the sentence imposed was procedurally unreasonable because the district court did not address his arguments for mitigation. He contends that, at the revocation hearing,

defense counsel raised several mitigating factors that went unmentioned by the district court, including the difficulty Keisel faced in obtaining employment, his exemplary work history, his family ties with his son, his compliance with the terms of his supervised release, his lack of a drug problem, his maintaining sex-offender-registration standards, and his positive reaction to treatment. While it is true that the district court did not specifically mention many of these factors in explaining its sentencing decision, the record makes clear that the court considered all of the facts and arguments presented and focused on the most relevant factors and considerations in rendering its decision.

"This court has made it clear that a district court need not explain its reasons for rejecting each argument made by a defendant." *United States v. Polihonki*, 543 F.3d 318, 325 (6th Cir. 2008) (quoting *United States v. Smith*, 510 F.3d 603, 608 (6th Cir. 2007)) (quotation marks omitted). Nor is there a "requirement . . . that the district court engage in a ritualistic incantation to establish consideration of a legal issue or . . . make specific findings related to each of the factors considered." *United States v. Bolds*, 511 F.3d 568, 580 (6th Cir. 2007) (internal quotation marks and citations omitted). Rather, "district courts often (permissibly) reject defendants' sentencing arguments indirectly when they provide affirmative reasons for imposing a sentence." *United States v. Steeby*, 350 F. App'x 50, 52 (6th Cir. 2009) (citation omitted). "It is sufficient if the district judge set[s] forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority." *Lapsins*, 570 F.3d at 773 (internal quotation marks and citation omitted) (alteration in original).

Here, the record reflects that the district court heard and considered both parties' arguments on revocation and sentencing and addressed all of Keisel's "nonfrivolous" arguments seeking a lower sentence. *United States v. Gapinski*, 561 F.3d 467, 474 (6th Cir. 2009) (citation and alterations omitted). Importantly, the court focused in great detail on Keisel's compliance with the terms of supervised release and his response to and need for treatment. The district court, for example, described Keisel's *lack* of compliance with the conditions of supervised release, noting that "his actions . . . are unpredictable, and the Court has no assurance of where is at any given time because he, obviously, does not consider [the travel] restrictions binding on him." It further noted Keisel's "disturbing and bizarre" behavior regarding his trips to Michigan and efforts to move there permanently, including Keisel's creating and submitting to the probation office a document purporting to come from his attorney's office. The court also stated that it had "serious concerns about Mr. Keisel's mental stability," such that it was possible that Keisel "was living in a world that is not real in his mind." These considerations, while certainly not in Keisel's favor, demonstrate that the district court fully engaged with the question of whether Keisel's post-release behavior demonstrated compliance with the conditions of supervised release and a positive reaction to treatment.

Moreover, it is clear from the record that the district court had Keisel's difficulties and successes in obtaining employment well "within the court's contemplation" at sentencing. *See Polihonki*, 543 F.3d at 325. Just prior to the district court's revocation and sentencing decision, the government reiterated the most significant mitigation argument made by Keisel—the impact of his sex offender status on his ability find full-time employment. Because both parties referenced

13

Keisel's employment status during the revocation hearing, it is unlikely that the district court ignored this factor in sentencing Keisel. *See id.* at 325 (concluding that because the defendant and defense counsel each referenced Polihonki's employment status during revocation hearing, the district court considered his mitigation argument despite not expressly stating so).

The record demonstrates, therefore, that the district court "set[] forth enough to [show] that [it] considered the parties' arguments and ha[d] a reasoned basis for exercising [its] own legal decisionmaking authority." *Lapsins*, 570 F.3d at 773 (internal quotation marks and citation omitted). Because district court explained its bases for revoking supervised release and imposing a sentence on Keisel, it did not plainly err by not specifically rejecting each of Keisel's proffered mitigating factors.

IV.

"If the district court's sentencing decision is procedurally sound, we must 'then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard[,] . . . tak[ing] into account the totality of the circumstances, including the extent of any variance from the Guidelines range.'" *Polihonki*, 543 F.3d at 322 (quoting *Gall*, 552 U.S. at 51) (alterations in original). Where the sentence imposed is outside of the Guidelines range, this court must give "due deference" to the district court's determination that the 18 U.S.C. § 3553(a) factors justify the variance. *Gall*, 552 U.S. at 51. "The fact that [this court] might have reasonably concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." *Bolds*, 511 F.3d at 581 (quoting *Gall*, 552 U.S. at 51) (quotation marks omitted).

14

Keisel contends that the twelve-month sentence imposed by the district court was excessive in light of the calculated Guidelines range of four to ten months, the lesser punishments sought by the probation office and government counsel, and the nature of the violations admitted by Keisel. He also argues that the district court's concerns regarding his mental stability should have been addressed by outpatient or less restrictive treatment.

The district court, however, provided a "sufficiently compelling justification for its departure from the Sentencing Commissions's recommendations." *Id*. at 582. Keisel's repeated violation of the conditions of supervised release, erratic and bizarre behavior, and lack of truthfulness before the court all support the imposition of a sentence above the recommended sentencing range. This court has previously concluded, for example, that where a defendant "violated several terms of his supervised release, forged documents[,] . . . and lied to his probation officer," the district court's eighteen-month sentence—eight months above the recommended Guidelines range—was not unreasonable. *See United States v. Johnson*, 403 F.3d 813, 817 (6th Cir. 2005). Additionally, the district court permissibly took into consideration Keisel's mental stability and potential danger to himself and others, such as his ex-wife. This court has previously affirmed sentences outside of the recommended Guidelines range where the district court, along with other factors, determined that additional time in custody would be beneficial to the defendant for purposes of medical care or drug treatment. *See, e.g.*, *Bolds*, 511 F.3d at 582 (concluding that the district court's above-Guidelines sentence was reasonable in light of the court's consideration of, among other things, "the need to protect the public from Bolds[] and the need to provide Bolds and her child with necessary medical care"); *Johnson*, 403 F.3d at 817 ("[T]he district court's desire to give Defendant a sentence to help

him gain the maximum benefit of a drug treatment program was not unreasonable."); *United States v. Williams*, 333 F. App'x 63, 71 (6th Cir. 2009) (concluding that the district court's consideration of the defendant's need for drug and "mental health treatment while incarcerated" supported its imposition of a term of incarceration rather than alternate treatment).

For these reasons, the twelve-month sentence imposed by the district court was substantively reasonable.

V.

For the foregoing reasons, we affirm the district court's revocation of supervised release and the sentence imposed.