NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0433n.06

No. 08-5610

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

**Jun 29, 2011**

LEONARD GREEN, Clerk

UNITED STATES OF AMERICA,               )
                                        )
        Plaintiff-Appellee,             )        ON APPEAL FROM THE
                                        )        UNITED STATES DISTRICT
        v.                              )        COURT FOR THE WESTERN
                                        )        DISTRICT OF TENNESSEE
ANTWAN WEBSTER,                         )
                                        )
        Defendant-Appellant.            )
                                        )

BEFORE: BATCHELDER, Chief Judge; SUHRHEINRICH and GRIFFIN, Circuit Judges.

GRIFFIN, Circuit Judge.

Defendant Antwan Webster appeals as procedurally unreasonable the sixty-month sentence that he received for violating the conditions of his supervised release. He contends that, contrary to the district court's conclusion, the government failed to establish a Grade A violation by a preponderance of the evidence and, therefore, the district court abused its discretion in relying upon clearly erroneous findings in imposing the sentence. We disagree and affirm.

I.

In May 2002, Webster pled guilty to one count of aiding and abetting an armed bank robbery, in violation of 18 U.S.C. §§ 2 and 2113(a), and one count of aiding and abetting in the carrying of a firearm during a crime of violence, contrary to 18 U.S.C. §§ 2 and 924(c)(1)(A)(i), stemming from the robbery of a Mississippi bank in November 2001. On August 22, 2002, the district court

sentenced Webster to ninety-six months of imprisonment and five years of supervised release.

Webster's supervised release commenced on February 27, 2007. Pursuant to an August 8, 2007,

order, jurisdiction over his supervised release was transferred from the Northern District of

Mississippi to the Western District of Tennessee.

On November 12, 2007, the district court granted the United States Probation Office's

petition for an arrest warrant for Webster, on the grounds that he was not complying with the terms

of his supervised release. The petition alleged five violations. The first, a Grade A violation,[1]

alleged that Webster participated in new criminal conduct by acting as the getaway driver in the

robbery and murder of Kevin Valentine on May 21, 2007, in Memphis, Tennessee, resulting in his

arrest on charges of first-degree murder and aggravated robbery.[2] The remaining Grade B and C

violations cited by the probation office included Webster's failure to participate in substance abuse

treatment and testing; his unlawful use or possession of a controlled substance; his failure to work

regularly at a lawful occupation; and his association with a convicted felon without the permission

of the probation officer. Webster was arrested and detained pending a hearing on the alleged

violations.

---

[1]*See generally* U.S.S.G. § 7B1.1. "Where there is more than one violation of the conditions of supervision . . . the grade of the violation is determined by the violation having the most serious grade." U.S.S.G. § 7B1.1(b).

[2]Webster was later released after the charges were dismissed for lack of prosecution on July 31, 2007.

At the supervised release violation hearing held on May 5, 2008, Webster pled guilty to the Grade B and C violations and contested only the Grade A violation – his alleged involvement in the robbery and murder of Valentine. Three teenage boys who witnessed Valentine's murder testified at the hearing, and the government introduced their written statements, taken shortly after the homicide, into evidence. Their statements and testimony were consistent. On May 21, 2007, the boys were walking home from school with their friends on Overton Crossing Street in Memphis. As they walked by a convenience store into an apartment complex, the boys interrupted an apparent robbery. A man they recognized by the nickname "Hustle Man" was sitting on the ground between two cars – one white and one black – and another man, whom they did not know, was standing nearby and pulled out a pistol. The boys surprised the gunman, and Hustle Man took this opportunity to successfully escape. As he fled, the gunman fired one shot at him. The gunman then turned and pointed his pistol at the boys. He attempted to fire, but the pistol jammed. The gunman said "Come on Cuz" and fled. As soon as he spoke, the boys heard another commotion and noticed two men fighting on the second-floor balcony of the apartments. One of the men pulled out a gun and fatally shot the other man, Kevin Valentine, known to the boys as "Tear Drop." According to the teens, the second gunman ran down the steps and fled in the same direction as the first gunman.

Two of the teens made identifications from a photographic lineup. The first boy identified Carlos Banks as the person who shot Valentine, the second boy identified Banks as the first gunman who had pointed the pistol at the children, and the third boy was unable to make an identification of any kind.

At the time of the murder, a surveillance camera at the nearby convenience store captured a white Ford Taurus backing into the parking lot, an African-American male exiting the rear seat and walking out of view, and shortly thereafter, two African-American males running across the back side of the apartment complex.

On June 11, 2007, the investigating officer, Connie Justice, was dispatched to the scene of a domestic violence call where Shanika Washington, Carlos Banks' girlfriend, was providing information regarding the death of Valentine. When Justice arrived, Carlos Banks was in one police car and Webster was in another. Washington told Justice that three people were involved in Valentine's murder – Banks, Webster, and another individual named "Nick." Washington pointed out a white Ford Taurus that was parked in the driveway. According to Washington, the Taurus, which belonged to Webster, was used in the homicide. Washington also told Justice that there was dark clothing inside the Taurus that had been used by the men in several robberies. The Taurus matched the vehicle seen on the store surveillance camera at the time of Valentine's murder. Webster signed a consent to search the Taurus. Inside the car, Justice found a dark tee shirt, dark pants, a blue and black neoprene mask, black skull caps, dark tennis shoes, and a box of latex gloves. However, the suspects on the surveillance video were not wearing similar clothing.

Washington gave Justice a written statement, which was admitted into evidence at Webster's hearing. According to the statement, Banks confessed to Washington that he, Webster, and a third person – "Nick" – planned on robbing a local drug dealer who lived in the Overton Crossings apartment complex because they needed money. When this person was not there, they decided

instead to rob Valentine, who also lived in the apartments and dealt in marijuana, with cash on hand.

Webster drove his white Ford Taurus with Banks and Nick to the apartment complex. Webster

parked near the side of a convenience store, where there was a hole in the gate separating the store

from the apartments. Their alleged intent was to avoid the store's surveillance cameras. Carlos and

Nick exited the vehicle, went into the apartment complex, and robbed and shot Valentine.

Washington's statement detailed the shooting: "Carlos told me that [Valentine] gave up a struggle

and he was holding Nick, to try to keep him from struggling him [sic] and that's when he shot him.

Carlos said Nick shot him four times and Carlos only shot once, that was to scare the teenage boys."

Washington stated that Webster was the driver of the car used in the robbery and murder of

Valentine:

> [Webster] and Carlos both told the story telling that [Webster] was only the driver,
> because he didn't know much about the apartments. Yet Carlos knew the apartment
> inside and out. [Webster] said that he parked in a good spot, but Nick messed up by
> getting out of the wrong side of the car. [Webster] thought that the store camera only
> got the end of the car.

Washington correctly identified Webster in a photographic lineup. She also told Justice that

Carlos Banks' sister, Shunta Allen, went with Banks to scout the apartment complex and purchase

marijuana before the robbery and homicide occurred. Allen was also Webster's girlfriend. Based

on this information, Justice interviewed Allen, who provided a written statement in which she stated

that she was present when the robbery was planned and confirmed that she had accompanied Banks

when he scouted the apartments for the robbery. In her statement, Allen said that Banks took her

home after she purchased marijuana from Valentine. Approximately fifteen minutes later, Banks

left with Webster and Nick. Nick and Banks each had a gun. The three men returned a short time later, acting nervous and scared, and Nick had blood on the front of his shirt. Webster told Allen that he drove Banks and Nick to the convenience store and waited while Banks and Nick went into the apartment complex; when the two men ran back to the car a short time later, Nick's shirt was covered with blood. Allen identified Webster and Banks as the suspects in a photographic lineup. She was also able to correctly identify Valentine in a photograph as the person from whom she bought marijuana.

Washington became an uncooperative witness and failed to appear at numerous state court proceedings related to the crimes. Consequently, the State of Tennessee's murder prosecution was frustrated and ultimately terminated for lack of prosecution. Washington was unwilling to meet with Justice after the initial interview and, at Webster's hearing, essentially recanted her prior written statement, claiming that it was untrue. She testified that she was enraged after finding Banks with another woman and, aware that he had an outstanding warrant, she called the police. Because she felt like "everyone was against [her]," she made her statement to the police implicating Banks, Webster, and Nick in the crime. However, she testified that she fabricated her account of the events in her statement and lied about Webster, Banks, and Nick being involved. Washington now claimed that she was in an apartment adjacent to the murder scene when Valentine was fatally shot and saw Valentine and an unidentified man fighting over a gun. She did not see the actual shooting, but heard the shots. She opted, however, not to call the police.

Shunta Allen also testified at Webster's hearing. Her testimony concerning the pertinent events was largely consistent with her written statement. Allen testified that she saw Banks and Nick depart together in Webster's car; Webster was the driver. The men returned a short time later with nervous demeanors. Nick returned with a gun and had blood on his shirt. Although she saw Banks with a gun when he left, upon his return he did not have one. Allen acknowledged identifying Webster in a photographic lineup and telling the police that he drove the others to the apartment where they shot Valentine. However, in her testimony, she denied that she heard Banks and Webster planning the robbery, and further denied that Webster made any statements to her about his role in the crime. In this regard, she did not contend that her statement was untruthful, only that she did not remember. Allen denied that she was the getaway driver. She testified that she missed her previous court appearances because Webster told her not to show up. She added that she received phone calls threatening to kidnap her if she testified in court.

At the conclusion of the testimony, Webster addressed the district court and insisted that he did not play any role in the death of Valentine. However, the court concluded that the government had produced "ample" and "overwhelming" evidence showing that Webster participated in the robbery and homicide and therefore violated the terms of his supervised release. The district court found that Washington's testimony was impeached, and she would not be regarded as a truthful witness in court. Nonetheless, the court noted that Washington "clear[ly] . . . had knowledge of events" surrounding the crime. In light of Allen's reluctant but "truthful" testimony concerning Webster's involvement in the murder, which was consistent with the evidence provided by the

teenagers and the surveillance film, the district court held that the government fulfilled its burden

of showing the Grade A violation by a preponderance of the evidence. The court sentenced Webster

to the maximum statutory sentence of sixty months of imprisonment.[3] Webster now timely appeals

his sentence.

## II.

A district court has the power to "revoke a term of supervised release, and require the

defendant to serve [time] in prison . . . if the court . . . finds by a preponderance of the evidence that

the defendant violated a condition of supervised release . . . ." 18 U.S.C. § 3583(e)(3); *United States*

*v. Carr*, 421 F.3d 425, 429 (6th Cir. 2005).[4] We review the district court's decision "for abuse of

discretion, giving fresh review to its legal conclusions, and clear-error review to its fact findings[.]"

*United States v. Kontrol*, 554 F.3d 1089, 1091-92 (6th Cir. 2009) (internal citations omitted).

Webster does not challenge the propriety of the district court's decision revoking his

supervised release given his admission that he committed the Grade B and C violations. A district

court need find only a single violation to revoke a defendant's supervised release. *United States v.*

*Cofield*, 233 F.3d 405, 408 (6th Cir. 2000) (citing 18 U.S.C. § 3583(e)); *United States v. Menichino*,

---

[3]The Grade B violation called for a sentence between 21 and 27 months of incarceration, while the Grade C violations carried a recommended Guidelines range of 8 to 14 months. U.S.S.G. § 7B1.4(a) (2009). The advisory Guidelines range for the Grade A violation was 51 to 63 months of imprisonment, *id*., but was governed by the statutory maximum term of imprisonment. *See* U.S.S.G. § 7B1.4(b).

[4]"The common definition of the phrase 'preponderance of the evidence,' as found in law treatises and standard jury instructions, is evidence that is of greater weight, on balance, than that offered in opposition to it." *Benge v. Johnson*, 474 F.3d 236, 248 (6th Cir. 2007).

103 F. App'x 884, 887 (6th Cir. 2004) (unpublished). However, he contends that it was an abuse

of discretion for the district court to use the Grade A violation as the basis for his sentence because

it was not established by a preponderance of the evidence. Webster thus argues that his 60-month

sentence is procedurally unreasonable because it is based upon clearly erroneous facts. We disagree.

"Sentences imposed for supervised release violations are reviewed under the same abuse of

discretion standard that we apply to sentences imposed following conviction." *United States v.*

*Peebles*, 624 F.3d 344, 347 (6th Cir. 2010) (citation and internal quotation marks omitted); *see also*

*United States v. Polihonki*, 543 F.3d 318, 322 (6th Cir. 2008). "The sentence may be overturned

only if it is procedurally or substantively unreasonable." *Peebles*, 624 F.3d at 347. "A district court

necessarily abuses its sentencing discretion if it 'commit[s] [a] significant procedural error, such as

failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as

mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous

facts, or failing to adequately explain the chosen sentence – including an explanation for any

deviation from the Guidelines range." *United States v. Bolds*, 511 F.3d 568, 579 (6th Cir. 2007)

(quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)).

It is settled that "the [district] court may consider evidence at a revocation hearing that would

be inadmissible in a criminal prosecution[,]" including reliable hearsay. *United States v. Kirby*, 418

F.3d 621, 628 (6th Cir. 2005). *See also United States v. Keisel*, 400 F. App'x 33, 39 (6th Cir. 2010)

(unpublished) ("A revocation hearing need not be as formal as trial proceedings, and a trial court can

consider any relevant evidence, including hearsay, which bears upon the court's inquiry into whether

the defendant has violated the terms and conditions of his . . . supervised release[.]") (citation and internal quotation marks omitted). Moreover, at a supervised release hearing, "the credibility of witnesses is in the province of the factfinder and [we] will not ordinarily review the factfinder's determination of credibility." *United States v. Copeland*, 20 F.3d 412, 413 (11th Cir. 1994); *cf. Brooks v. Tennessee*, 626 F.3d 878, 900 (6th Cir. 2010) ("In addressing sufficiency of the evidence questions, this Court has long recognized that we do not weigh the evidence, consider the credibility of witnesses or substitute our judgment for that of the [fact-finder].") (citation and internal quotation marks omitted). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Brooks*, 626 F.3d at 900 (citation and internal quotation marks omitted).

Here, Webster characterizes both Washington's and Allen's testimony as inconsistent, as well as "materially false and unreliable." However, we agree with the government that, even discounting Washington's recanted statement, the remaining evidence, when viewed in the light most favorable to the prosecution, is sufficient to establish Webster's participation in Valentine's murder by a preponderance of the evidence. Allen testified that she scouted out the location of the planned robbery with Banks and purchased marijuana from Valentine; that Webster, Banks, and Nick, armed with pistols, left together in Webster's white Ford Taurus; and that they returned shortly thereafter, acting unusually nervous, and Nick had blood on his clothes. She identified Webster from a photographic lineup as one of the suspects and further demonstrated her actual knowledge by identifying Valentine in a photo.

The district court was in the best position to assess Allen's credibility and found that she was "reluctantly truthful," understandably so when judged against the backdrop of the threats that were made against her, both anonymously and by Webster, regarding her appearance at the hearing. We will not disturb the court's credibility determinations. The reasonable inference to be drawn from this evidence is that Webster drove Banks and Nick to and from the murder fully aware of what they were going to do.

Allen's testimony is supported by other independent evidence – the teenagers' identification of Banks at the scene, Washington's written statement that closely paralleled Allen's description of events, and the surveillance video showing two African-American males scrambling to escape in a white Taurus. In short, the record contains ample evidence to support the district court's finding that Webster participated in Valentine's murder. It therefore was not procedurally unreasonable, or an abuse of discretion, for the district court to rely upon this finding when it sentenced Webster to the statutory maximum term of sixty months of imprisonment for the Grade A violation.

III.

The judgment of the district court is therefore affirmed.