RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 10a0360p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

DONALD GENE BROOKS,

              *Petitioner-Appellant,*

    *v.*

STATE OF TENNESSEE,

              *Respondent-Appellee.*

No. 07-5415

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 03-00821—William J. Haynes, Jr., District Judge.

Argued: March 10, 2010

Decided and Filed: November 23, 2010

Before: DAUGHTREY, GILMAN, and KETHLEDGE, Circuit Judges.

_____

### COUNSEL

**ARGUED:** Michael C. Holley, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Nashville, Tennessee, for Appellant. James E. Gaylord, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee. **ON BRIEF:** Michael C. Holley, Caryll S. Alpert, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Nashville, Tennessee, for Appellant. James E. Gaylord, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee.

    GILMAN, J., delivered the opinion of the court, in which KETHLEDGE, J., joined. DAUGHTREY, J. (pp. 29–33), delivered a separate opinion concurring in the judgment.

1

―――――――――

**OPINION**

―――――――――

RONALD LEE GILMAN, Circuit Judge.   Following a jury trial in the Montgomery County Criminal Court in Tennessee, Donald Gene Brooks was convicted of first-degree felony murder, especially aggravated robbery, theft of property valued over $1,000, and setting fire to personal property.  He was sentenced to life plus 27 years of imprisonment.   After Brooks's conviction and sentence were affirmed on direct appeal, he petitioned for state postconviction relief, but was turned down at all levels of the state judiciary.  He subsequently filed a petition for federal habeas corpus relief, raising a total of 11 claims.  The district court denied his petition, but certified five claims for appeal.  This court later certified two additional claims.

The certified claims all relate to purported prosecutorial misconduct involving the failure to disclose material evidence, the alleged use of a jailhouse informant to elicit incriminating statements from Brooks, and the presentation of allegedly false testimony at trial.  For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

The following factual recitation (in Parts I.A. and I.B.) is derived from the opinion of the Tennessee Court of Criminal Appeals, which affirmed Brooks's conviction and sentence on direct appeal.   *See State v. Brooks*, No. 01-C101-9703-CC-00099, 1998 WL 299267, at *1-*6 (Tenn. Crim. App. June 9, 1998).

**A.      Factual background**

Joseph J. Wisniewski was discovered bleeding from his neck on the side of Barge Point Road  in Clarksville, Tennessee shortly after 4:00 P.M. on October 28, 1994.  His throat had been cut.  Emergency personnel were unable to save Wisniewski, and he died at the scene.

Earlier that day, Wisniewski had left his home to go to the Pickle Factory bar in Clarksville. He had approximately $200 in cash on his person. Brooks was also at the bar, and Wisniewski drank with him and several other patrons, including Edwin Lunceford and Randy Herdman.

That afternoon, Wisniewski offered Herdman a ride home from the bar. Lunceford, believing that Wisniewski was too drunk to drive, convinced Wisniewski to let Lunceford drive Wisniewski's car. Brooks, Herdman, Lunceford, and Wisniewski then left the bar and drove to a convenience store. Brooks went inside and purchased a twelve-pack of Bud Light. The men then dropped Herdman off at his home.

Soon thereafter, Brooks, Lunceford, and Wisniewski pulled over on Barge Point Road to relieve themselves. They all got out of the car and, when Lunceford had finished relieving himself, he turned around to see Brooks holding a knife to Wisniewski's throat. Wisniewski's wallet was on the trunk of the car. Brooks ordered Lunceford to take the wallet. After Lunceford did so, he walked over to Wisniewski and punched him in the jaw, purportedly to prevent Wisniewski from being able to identify him. Brooks then cut Wisniewski's throat with the knife.

Immediately afterwards, Brooks and Lunceford got back into Wisniewski's car. Brooks drove, leaving Wisniewski on the side of Barge Point Road. From there, Brooks and Lunceford drove around the area, drinking and smoking crack cocaine. Brooks threw his knife, Wisniewski's wallet, and some of the wallet's contents in a creek bank. At one point, Lunceford asked Brooks why he had killed Wisniewski, and Brooks replied that Wisniewski could not identify them now.

Brooks and Lunceford eventually drove to the home of Connie Gonzalez, Brooks's girlfriend, and parked Wisniewski's car under the breezeway of a nearby church. They carried some items that they had discovered in the trunk of the car into Gonzalez's home. The two men then went back to the car, doused it with charcoal lighter fluid, and set it on fire. About ten minutes later, they returned to Gonzalez's house and drank alcohol and smoked crack throughout the night in an upstairs room. Brooks hid Wisniewski's car keys inside a stuffed animal that he found there.

Shortly after the homicide, Brooks came to Lunceford's home on three or four occasions to "work up a story" about the crimes. Lunceford did not promptly contact law enforcement because Brooks threatened to harm Lunceford and his family if Lunceford said anything. Finally, in April 1995, Lunceford called Officer Marty Watson at the Clarksville Police Department concerning the crimes. Officer Watson in turn contacted Detective Alan Charvis, the lead investigator on Wisniewski's homicide. Detective Charvis had no probable suspect until Lunceford came forward.

Lunceford informed the officers that he had information about the Wisniewski homicide, but demanded immunity from prosecution and the presence of a representative from the district attorney's office as prerequisites to making a statement. After being granted conditional immunity (which provided that he would not be prosecuted so long as he was not the one who had killed Wisniewski), Lunceford told the officers about the events of October 28, 1994. He also led law enforcement to a creek where he believed that Brooks had disposed of the knife and Wisniewski's wallet. Later, Lunceford told Detective Charvis that the location where these items were discarded was in fact another creek. Nothing was found at either location.

The police then arranged for Lunceford to initiate conversations with Brooks while wearing a "wire" that would transmit and tape record the conversations. According to Lunceford, Brooks admitted during the first such conversation that he had killed Wisniewski, but the wire malfunctioned and the recording was inaudible. In subsequent conversations, Brooks made statements such as "loose lips sink ships." He would also claim ignorance, saying "I don't know nothing," and then laugh. At one point, Lunceford said that he was just as guilty as Brooks and that Brooks was in denial. Brooks then repeated, "I am in denial," and laughed. At another point, Lunceford professed concern because his probation officer had been by his house to talk to Lunceford about the Wisniewski homicide. Brooks responded by reassuring Lunceford that there was nothing to worry about and that Lunceford should just follow the plan that they had talked about the previous day.

Eventually, Brooks became suspicious of Lunceford. While they were in the restroom at the Pickle Factory bar, Brooks asked Lunceford if he was wearing a wire and told Lunceford to lift up his shirt. Brooks then searched Lunceford, but failed to discover the wire. Soon thereafter, the police moved in and arrested Brooks for the murder of Wisniewski.

B.     **State-court trial testimony**

At trial, Lunceford was the main witness against Brooks. Lunceford was then serving time for felony convictions of robbery and forgery, and he admitted to numerous past offenses of driving under the influence, driving on a revoked license, and "simple assaults or domestic disputes." Most of the factual narrative set forth above is based on Lunceford's testimony.

The prosecution also introduced physical evidence, which included two Bud Light cans discovered near Wisniewski's body on Barge Point Road. Special Agent Hoyt Phillips of the Tennessee Bureau of Investigation (TBI) testified that he had processed the beer cans for latent fingerprints. He explained that he had found Brooks's left thumb print on one of the cans and Brooks's left palm print on the other can.

In addition, TBI Special Agent Anthony Clark, formerly of the Clarksville Police Department, testified that he was one of the officers who searched Connie Gonzalez's home as part of the police investigation. They discovered a stuffed animal that had been torn or cut. A key ring with car keys belonging to Wisniewski was found inside of the stuffed animal.

Finally, Michael Wayne Nelson, a convicted felon then serving time in prison, testified that he and Brooks shared a cell in the Montgomery County Jail on June 7, 1996. Nelson stated that Brooks confessed his guilt to Nelson. Brooks provided Nelson with details of the crime that were consistent with Lunceford's testimony of what had happened. He also told Nelson that the only evidence against Brooks was his companion at the time of the crime, and that he wished that he had killed his companion as well.

Nelson admitted during his direct examination that he had prior convictions for larceny from a person, grand larceny, and escape. He also acknowledged that he was facing breach-of-trust charges at the time of his testimony for failing to return to the Nashville Community Service Center after having been placed on parole.

When the prosecution rested, Brooks proceeded with several witnesses of his own. These included Melissa Ann Springfield Conner, who was one of Lunceford's friends. She testified that Lunceford had told her that he was involved in a murder trial. He said that the police had wired him and given him money and drugs to go into a bar, where he was to "party" with a man and get the man sufficiently "messed up" to confess. This testimony contradicted Lunceford's testimony that he had not received any money from the police. Conner also said that she doubted the veracity of Lunceford's story that he had no involvement with the crimes other than to have gone along with the perpetrator.

Another defense witness was Debbie O'Bryan, a former bartender and manager of the Pickle Factory bar. O'Bryan recalled Brooks, Lunceford, Wisniewski, and others being at the bar on October 28, 1994. She did not recall Herdman being there. Lunceford was in and out all day. Brooks left at times, but was never gone for more than 5 to 10 minutes. O'Bryan left the bar for around 45 minutes. Brooks was at the bar when she left and was there when she returned. But O'Bryan conceded that separating the events of one day from those of another as far back as the date of Wisniewski's death was difficult.

The next defense witness was Fred Lunceford (Fred), Edwin Lunceford's brother. He recalled a conversation that he had had with his brother about Wisniewski's death. Lunceford told Fred that a woman had been with him and Brooks at the time of the killing. This contradicted Lunceford's testimony that only he and Brooks were with Wisniewski on Barge Point Road.

Dorothy Suggs, a part-time employee of the Pickle Factory bar on October 28, 1994, followed Fred as a witness. She did not learn of Wisniewski's death until a long time afterwards. When she heard of it, she asked Debbie O'Bryan whether the death

occurred on the same day that Suggs had sat at a table with Wisniewski and others at the Pickle Factory bar, which O'Bryan confirmed. On that day, Wisniewski bought beers for a large group of people, including Brooks and Lunceford. Wisniewski expressed his desire to go to another bar at some point that afternoon. A patron nicknamed "Boston Rick" (later identified as Richard Roberts) picked up Wisniewski's car keys and said that he would take Wisniewski. Lunceford said that he would go as well, and the three men left. A female patron may have accompanied the men. Suggs admitted that she and Brooks are good friends, and that Brooks had spent the night in her home on occasions when he was too drunk to drive to his own home.

Lieutenant Douglas Tackett, a Sheriff's Department administrator at the Montgomery County Jail, was the final defense witness. He stated that he had known Michael Nelson for about 15 years and did not believe him to be truthful.

In rebuttal, the State recalled Agent Clark, who said that Debbie O'Bryan had told him during her interview that she had no knowledge of what had allegedly happened at the Pickle Factory bar on October 28, 1994. This concluded all of the testimony at trial.

Brooks was found guilty of first-degree felony murder, especially aggravated robbery, theft of property valued over $1,000, and setting fire to personal property. His timely appeal followed.

## C.     Further state-court proceedings

Brooks appealed his conviction and sentence to the Tennessee Court of Criminal Appeals, challenging the sufficiency of the evidence and the length of the sentence imposed. *State v. Brooks*, No. 01C01-9703-CC-00099, 1998 WL 299267 (Tenn. Crim. App. June 9, 1998). His sufficiency-of-the-evidence claim focused on Lunceford's lack of credibility and Brooks's two alibi witnesses who testified that he was at the Pickle Factory bar when the murder occurred. After an extensive review of the evidence at Brooks's trial, the Tennessee Court of Criminal Appeals found that a reasonable jury could have chosen to believe Lunceford and to disbelieve Brooks's alibi witnesses. The

court therefore affirmed Brooks's conviction, and the Tennessee Supreme Court declined review.

Brooks then filed a pro se petition for postconviction relief in the Circuit Court for the 19th Judicial District of Tennessee (Tennessee Circuit Court). He challenged numerous aspects of his criminal investigation and trial, raising claims of prosecutorial misconduct that primarily concerned the involvement of Lunceford. In addition, Brooks claimed to have received ineffective assistance of trial counsel for reasons that included counsel's alleged failure (1) to investigate evidence implicating Boston Rick, (2) to pursue evidence that an identifiable but unmatched latent fingerprint was discovered on one of the beer cans recovered on Barge Point Road, and (3) to object to the perjured testimony of Agent Phillips that Brooks's prints were discovered on both beer cans recovered at the scene of the killing, when in fact Brooks's palm print was discovered on one of the cans and no print matched to Brooks was found on the other.

The Tennessee Circuit Court appointed counsel to represent Brooks during the postconviction proceedings. His counsel subsequently filed an amended petition for postconviction relief, adopting and incorporating by reference all of the claims included in Brooks's pro se petition and adding 11 ineffective-assistance-of-counsel claims and two additional bases for relief that are not relevant to the instant appeal. After an evidentiary hearing, the Tennessee Circuit Court concluded that the claims raised in the pro se petition either lacked merit, were waived, or had previously been rejected by the Tennessee Court of Criminal Appeals. The court denied on the merits all issues raised in the counseled petition except for Brooks's claim that his appellate counsel was ineffective for failing to challenge certain aspects of Brooks's sentence.

Both Brooks and the State appealed. Brooks challenged the Tennessee Circuit Court's determination that he had received effective assistance of counsel at trial and on most aspects of his appeal, and the State challenged the court's conclusion that Brooks had received ineffective assistance on appeal concerning his sentence. The Tennessee Court of Criminal Appeals affirmed the portion of the trial court's judgment denying Brooks's claims and reversed the portion granting Brooks's ineffective-assistance-of-

appellate-counsel claim.  *Brooks v. State*, No. M2002-00386-CCA-R3-PC, 2003 WL 288434 (Tenn. Crim. App. Feb. 11, 2003).  As for the claim that Brooks's trial counsel failed to investigate evidence implicating Richard Roberts, also known as Boston Rick, the court concluded that Brooks had not demonstrated ineffective assistance of counsel because the State presented evidence at the postconviction hearing that the TBI had compared Mr. Roberts's prints to the Barge Point Road beer cans and found no match. (A careful review of the record evidence, however, demonstrates that the factual basis for this conclusion is erroneous because the TBI did not in fact compare Mr. Roberts's prints to the Barge Point Road beer cans.)  The Tennessee Court of Criminal Appeals denied Brooks's petition, and the Tennessee Supreme Court declined to review the intermediate court's decision.

## D.       Federal habeas proceedings

In late 2003, Brooks filed in the district court a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The court appointed counsel to represent Brooks.  Relevant to the instant appeal are Brooks's claims that (1) the prosecution knowingly permitted false testimony by several witnesses, (2) the prosecution recruited a jailhouse informant to elicit a confession of guilt from Brooks, and (3) the prosecution failed to disclose material impeaching information about the informant.  *Brooks v. Tennessee*, No. 3:03-0821, 2007 WL 1047635 (M.D. Tenn. Mar. 30, 2007).

In response, the State argued that certain of Brooks's claims were procedurally defaulted, others were barred by the applicable statute of limitations, and the rest were rejected by the Tennessee state courts in decisions that constituted reasonable applications of federal law.  Brooks replied that his claims were not procedurally defaulted and, even if they were, that he could establish cause and prejudice to excuse the defaults.

The district court held an evidentiary hearing on Brooks's claims brought pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and on the issue of procedural default.  Brooks presented evidence at this hearing that was discovered by a private investigator after the conclusion of the state postconviction proceedings.  This included

the recantation testimony of Michael Wayne Nelson (who was then going by the name of Michael Wayne Carter), the jailhouse informant who had testified against Brooks at trial.  The district court summarized the new testimony as follows:

> In this Court, [Nelson] testified that his trial testimony was totally false.  According to [Nelson], a female representative of the district attorney general's office approached him at the jail and told him that she had heard of his past assistance in [a previous] case and other cooperation with law enforcement authorities.  According to [Nelson], this representative offered to "take care of" [Nelson's] two pending charges[:] driving under the influence and parole violation.  In exchange, [Nelson] would have to agree to move into Brooks's cell and report what Brooks told him about hiding keys in a stuffed animal at his girl friend's residence.  [Nelson] insists that this prosecutor provided him with a written statement with information about [Brooks's] girl friend's address and that [Wisniewski's] automobile ha[d] been burned at a nearby church.  In a word, [Nelson] agreed and testified at Brooks's trial about Brooks's statements to him that [Brooks] killed [Wisniewski] and hid [Wisniewski's] car keys at his girlfriend's house.
>
> [Nelson] now insists that his trial testimony about [Brooks's] statements to him in the jail was provided by a state prosecutor.  Contrary to his trial testimony, [Nelson] testified in this Court that Brooks did not tell him anything about the murder.  According to [Nelson], his trial testimony was based upon a written statement that the prosecutor read to him.  [Nelson] denies that he told the prosecutor any of the statements that were in this written statement.  [Nelson] also acknowledged that in addition to his convictions cited by the Tennessee appellate courts, his prior criminal history also includes convictions for perjury and passing a forged instrument.
>
> [Nelson] also asserts that he told the assistant district attorney that he had a history of mental illness and at that time, was on medications for those illnesses.  According to [Nelson], he hears voices and is schizophrenic.  Excerpts of [Nelson's] medical files from the Tennessee Department of Correction ("TDOC") that detail his multiple suicide attempts and diagnoses of "organic mental disorder with hallucinations," and "schizophrenia" were introduced at the hearing.  According to [Nelson], TDOC officials placed [Nelson] in protective custody when he was transferred to TDOC.  On April 6, 2006, [Nelson] signed a hand-written statement that sets forth his testimony at the evidentiary hearing in this Court.
>
> . . . .

> [Brooks's trial attorney Edward] Dewerff characterized [Nelson] as an important trial witness. Dewerff did not recall any disclosure by the State that [Nelson], a state witness, had a perjury conviction. Dewerff cross-examined [Nelson] on his grand theft and larceny convictions as well as seven escapes. According to Dewerff, the jury was aware that [Nelson] was considered a snitch.

(Record citations omitted.)

"Despite awareness of the issues for the hearing," noted the district court, "the State did not offer any proof at the hearing. If believed, [Nelson's] testimony presented serious issues of perjury, presentation of false testimony by state prosecutor(s), withholding exculpatory evidence and violation of [Brooks's] right to counsel." Accordingly, the court issued an order directing members of the district attorney's office who worked on the prosecution of Brooks to appear at an evidentiary hearing to respond to Nelson's recantation, as well as to Brooks's assertion that Agent Phillips testified falsely at trial concerning the latent fingerprints discovered by the TBI on the two beer cans recovered at the scene of the homicide.

The district court summarized the testimony presented at the second evidentiary hearing as follows:

> Pursuant to Order of the Court, Helen Young, an assistant district attorney general in the Nineteenth Judicial District at the time of the investigation and [Brooks's] subsequent trial, testified that she never talked to [Nelson]. At that time, Young was the only female assistant district attorney and was involved in awarding Lunceford immunity, but was not involved in [Brooks's] trial. . . . Young explained that witness interviews were usually handled by the City's police detectives. According to police records, [Nelson's] interview that was the basis for his trial testimony, was conducted at the state prison and Young was not present for that interview. Arthur Bieber, an assistant attorney general since 1982 who was the state's prosecutor at [Brooks's] trial[,] testified that he did not offer any deal to [Nelson]. Bieber does not go to the jail to interview inmate witnesses unless they are victims. Bieber does not solicit inmates at the jail to elicit information . . . . Bieber did interview [Nelson] shortly before trial, but not at the jail.
>
> As to the TBI reports on the fingerprints, Young and Bieber explained that there is not any misrepresentation with the TBI agent's

testimony or reports. As Young explained, there were two TBI fingerprints reports: one in January, 1995 and the second in August, 1995. The former report reflected an analysis before the State had any information on the identity of the perpetrator(s). The latter TBI fingerprint report was generated after Lunceford came forth to implicate himself and [Brooks] in this murder. The August TBI report finds [Brooks's] fingerprints on one of the beer cans at the murder scene.

After these two evidentiary hearings, the district court ruled on Brooks's habeas petition. The court first determined that Brooks's claims were timely raised, but then decided that the claims addressed in the instant appeal were procedurally defaulted. Concerning Nelson's recanting of his trial testimony, the court concluded that Brooks had demonstrated cause for the procedural default because the recanting was "external to" the defense. The court determined that there was no prejudice to excuse the procedural default, however, because Nelson's later testimony was not credible and therefore did not establish prosecutorial misconduct:

> On its face, [Nelson's] testimony has obvious factual appeal. [Nelson] has a history of being considered a "snitch" and this fact, coupled with his presence in [Brooks's] cell and his trial testimony, tend to corroborate his testimony that state prosecutors approached him for that purpose. [Nelson's] testimony in this action is contrary to his self-interest as such testimony exposes him to a charge of perjury. As to [Nelson's] testimony about his disclosure of his mental condition to the state prosecutor prior to his trial testimony, the TDOC medical records corroborate that he has such a mental condition. The state record reflects that the state prosecutors should have had cause to question whether to call [Nelson] as a witness. At trial, a local police officer testified that [Nelson] was not credible, as the state appellate court noted: "Lieutenant Douglas Tackett testified he had known Michel Nelson for about fifteen years and did not believe him to be truthful." As noted, [Brooks's] trial counsel filed a *Brady* motion with a specific request for evidence of the State's promises to any witness.

> A[s] [a] general rule, "[t]he assessment of the credibility of witness is generally beyond the scope of [habeas] review." *Schlup v. Delo*, 513 U.S. 298, 330, 115 S.Ct. 851, 130 L.Ed.2d 808 (2003), but the court must do so in such instances of new evidence that seriously challenges [a habeas petitioner's] conviction. Here, as found by the Tennessee appellate court, Lunceford's testimony was the critical basis for [Brooks's] conviction. Given [Nelson's] mental history, his prior convictions and reputation for untruthfulness, his inconsistent testimony

about his role in these matters, and the testimony of the state prosecutors, the Court finds that [Nelson's] testimony about the state prosecutors is not credible.

(Record citations omitted.)

The district court next considered Brooks's claim that the prosecution had failed to disclose evidence of Nelson's past convictions for crimes involving dishonesty. It reasoned as follows:

> The state counsel's examination of the state prosecutors, however, did not address [Brooks's] assertions that disclosures of [Nelson's] criminal convictions for perjury and passing a forged instrument were not disclosed to [Brooks's] trial counsel as requested in his *Brady* motion. Standing alone, this nondisclosure would be material under *Brady*. Yet, the state trial court record reflects [Nelson's] other convictions, the testimony that [Nelson] was a snitch who testified for the State in exchange for favorable treatment and significantly, the testimony of a law enforcement official who had known [Nelson] for fifteen years, that [Nelson] was an unreliable and untruthful witness not worthy of belief. The latter testimony leads the Court to conclude that the State's failure to disclose these other convictions are not material for *Brady* purposes because the Court's confidence in the verdict is not undermined. As a result, there is not any showing of prejudice to excuse the procedural default.

The court did not address Brooks's argument that he was also prejudiced by the prosecution's failure to disclose evidence of Nelson's history of mental illness.

Regarding the claim that Agent Phillips testified falsely at trial about the fingerprints lifted from the beer cans recovered at the scene of the homicide, the district court provided the following brief analysis: "The Court also finds the state prosecutors' testimony about the TBI fingerprint reports to be credible. . . . Thus, [Brooks's] *Brady* claim does not involve material evidence in light of . . . the explanation of the TBI fingerprint reports."

In sum, the district court denied Brooks's petition for habeas relief. This appeal followed.

## II.  ANALYSIS

### A.      Standard of review

"In a habeas corpus appeal, we review the district court's legal conclusions de novo, but will not set aside its factual findings unless they are clearly erroneous." *Ivory v. Jackson*, 509 F.3d 284, 291 (6th Cir. 2007).   A factual finding is clearly erroneous where, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

"The standard for reviewing state-court determinations on habeas, by contrast, is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA), codified at 28 U.S.C. § 2254(d)." *Ivory*, 509 F.3d at 291.  AEDPA provides that

> a federal court may not grant a writ of habeas to a petitioner in state custody with respect to any claim adjudicated on the merits in state court unless (1) the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or (2) the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings."

*Taylor v. Withrow*, 288 F.3d 846, 850 (6th Cir. 2002) (citation omitted) (quoting 28 U.S.C. § 2254(d)).

A state-court decision is considered "contrary to . . . clearly established Federal law" if the two are "diametrically different, opposite in character or nature, or mutually opposed." *Williams v. Taylor*, 529 U.S. 362, 405 (2000) (internal quotation marks omitted) (quoting *Webster's Third New International Dictionary* 495 (1976)). Alternatively, to be deemed an "unreasonable application of . . . clearly established Federal law," a state-court decision on the merits must be "objectively unreasonable," not simply incorrect.  *Id.* at 409, 412.  The state court's findings of fact are presumed to be correct unless they are rebutted by clear and convincing evidence. *Benge v. Johnson*, 474 F.3d 236, 241 (6th Cir. 2007).

**B.     Certified claims and arguments of the parties**

Brooks applied for a Certificate of Appealability (COA) in the district court, which was granted as to the following five claims:

1.      [Brooks's] claim that the prosecution used false testimony of two witnesses in violation of [Brooks's] rights under the Fifth, Sixth, and Fourteenth Amendments; []

2.      [Brooks's] claim that his statement to a state informant, whom the State recruited, violated [Brooks's] Sixth Amendment right to counsel;

3.      [Brooks's] claim that the prosecution failed to disclose that the informant witness had a history of mental disorders[;]

4.      [Brooks's] claim that the prosecution failed to disclose critical portions of the informant's prior criminal history involving crimes of dishonesty; [and]

5.      [Brooks's] claim that the prosecution failed to disclose that the informant-witness had a history of receiving special treatment and privileges for providing information to law enforcement and correctional authorities.

In addition, this court, pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure, expanded the COA by agreeing to consider two more of Brooks's claims on appeal:

[6.]    whether the prosecution failed to disclose that the informant had testified falsely at a previous trial; and

[7.]    whether the prosecution knowingly presented false testimony of alleged coconspirator Edwin Lunceford, TBI Agent Hoyt Phillips, and the informant Michael Nelson [], in violation of the Fifth, Sixth, and Fourteenth Amendments.

Brooks has consolidated the seven certified claims into three issues on appeal. First, Brooks contends that the prosecution violated his due process rights by failing to disclose important impeaching information about Michael Nelson; specifically, that "he suffered chronic mental illnesses," that "he had prior felony convictions for forgery and perjury," that "he had a history of receiving privileges from authorities in exchange for

snitching," and that "he reportedly had testified falsely at a previous trial." Brooks next argues that the prosecution violated his due process rights when it failed to correct the false testimony "of Agent Phillips regarding fingerprint results, and the testimony of Michael Nelson regarding Brooks's putative confession." Finally, Brooks asserts that "the prosecution violated the Sixth Amendment by using Michael Nelson to question Brooks after [Brooks] had been appointed counsel."

Brooks has raised no argument in his briefs concerning the prosecution's purported presentation of false testimony by Edwin Lunceford. Accordingly, that issue is deemed waived. *See Ahlers v. Schebil*, 188 F.3d 365, 374 (6th Cir. 1999) (holding that a court may consider any claims not addressed in an appellant's brief to be waived).

The State responds that all of Brooks's certified claims are barred by procedural default. Further, the State argues that Brooks is unable to demonstrate cause and prejudice to excuse this procedural deficiency. It therefore urges us to affirm the judgment of the district court.

**C.      The procedural-default doctrine**

A habeas petitioner procedurally defaults a claim if the petitioner fails to comply with a state procedural rule that the state actually enforces and that constitutes an adequate and independent ground for denying review of a federal constitutional claim. *Monzo v. Edwards*, 281 F.3d 568, 576 (6th Cir. 2002). In order to excuse a procedural default, the petitioner must demonstrate cause for the default and must show that "actual prejudice resulted from the alleged constitutional error." *Ivory*, 509 F.3d at 293 (quoting *Monzo*, 281 F.3d at 576).

The "cause" factor requires the petitioner to show "some objective factor external to the defense [that] impeded [the defense's] efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Examples include "a showing that the factual or legal basis for a claim was not reasonably available" previously, or "some interference by officials." *Id.* (citation omitted). Regarding the "prejudice" factor, "[t]he habeas petitioner must show not merely that the errors at trial

created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 494 (emphasis in original) (alterations, citation, and internal quotation marks omitted).

**D.     Failure to disclose the Nelson impeachment materials**

Brooks argues that impeaching evidence concerning Nelson, the "jailhouse snitch," was withheld by the prosecution in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). In *Brady*, the Supreme Court held that a defendant's due process rights are violated where the government withholds evidence favorable to a defendant that is "material either to guilt or to punishment." *Id.* at 87. To demonstrate a *Brady* violation, a habeas petitioner must establish three elements: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). A habeas petitioner demonstrates prejudice by showing that the suppressed evidence is "material." *Id.* at 282.

A state's suppression of *Brady* evidence constitutes cause under the procedural-default doctrine. *Banks v. Dretke*, 540 U.S. 668, 691 (2004). The prejudice prong for both analyses is the same. *Id.* Thus, a petitioner who proves a *Brady* violation demonstrates cause and prejudice to excuse procedural default of the *Brady* claim. *Id.*

Brooks contends that the prosecution failed to disclose to defense counsel significant impeaching materials concerning Nelson, either prior to or during Brooks's trial in the Montgomery County Criminal Court. He identifies two categories of evidence that purportedly constitute *Brady* materials concerning Nelson: "(1) his Tennessee Department of Corrections records showing his chronic mental illnesses, his recurrent service as a snitch, and some perks of snitching; and (2) the Montgomery Country records showing his prior felony convictions for forgery and perjury." Brooks concedes that this claim is procedurally defaulted because he failed to raise it before the state courts, but argues that he has demonstrated cause and prejudice by setting forth a

meritorious *Brady* claim. He also argues that the only aspect of *Brady* at issue on appeal is the materiality of the suppressed evidence.

The State disagrees with Brooks. It contends that the suppression prong of the *Brady* analysis is also an issue on appeal. According to the State, Brooks has not demonstrated cause for his procedural default because he is unable to show that the Nelson impeachment materials were in fact suppressed by the State. The State also asserts that, in any event, the purportedly suppressed impeachment evidence is not material. Accordingly, the State reasons that Brooks has neither demonstrated a valid *Brady* claim nor excused his procedural default.

Because this claim was not previously raised before or adjudicated by the state courts, we review it under pre-AEDPA standards. *Joseph v. Coyle*, 469 F.3d 441, 469 (6th Cir. 2006) (explaining that this court reviews "a *Brady* claim based on evidence disclosed during federal habeas proceedings under pre-AEDPA standards because no state court reviewed the merits of that claim" (citation and internal quotation marks omitted)). We therefore will not set aside the district court's factual findings unless they are clearly erroneous, but will review an alleged *Brady* violation de novo because "whether a *Brady* violation occurred is a mixed question of law and fact." *Id.*

Brooks does not provide any substantive argument that the State withheld evidence of Nelson's "recurrent service as a snitch, and some perks of snitching," and therefore this argument is deemed waived. *See Spirko v. Mitchell*, 368 F.3d 603, 612 (6th Cir. 2004) ("It is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (citation and internal quotation marks omitted)). Regarding the evidence for which Brooks provides substantive argument—Nelson's history of mental illness and his convictions for forgery and perjury—the State does not dispute that this evidence is favorable to Brooks as impeachment material that could have been used to discredit Nelson's testimony about Brooks's putative jailhouse confession. And, for the purposes of this analysis, we will assume without deciding that the evidence was suppressed. This leaves the third *Brady* factor of prejudice, also described as the "materiality" of the

evidence. *See Strickler*, 527 U.S. at 282 (describing the "third component" of the *Brady* analysis as "whether petitioner has established the prejudice necessary to satisfy the 'materiality' inquiry").

The standard for *Brady* materiality was set forth by the Supreme Court in *Kyles v. Whitley*, 514 U.S. 419 (1995). As the Court there held, suppressed evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 433-34 (citation omitted). The reasonable-probability standard "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant)." *Id.* at 434. As the Supreme Court explained,

> [t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)). In making this determination, we review the evidence "collectively, not item by item." *Id.* at 436.

The documents discovered by Brooks during the federal habeas proceedings below and provided to this court demonstrate that, while incarcerated, Nelson (1) engaged in multiple suicide attempts, heard voices, suffered from insomnia, hallucinations, and alcohol abuse; (2) was diagnosed with malingering, antisocial personality disorder, self-mutilation, borderline mental retardation, schizophrenia, and "[o]rganic mental disorder with hallucinations"; and (3) was prescribed antipsychotic medications. In fact, in the two months before Nelson testified as a State witness at Brooks's trial in August 1996, Nelson refused to take his recommended medication for an infection in his leg, and he ingested paper clips. During the three months following

the trial, Nelson was prescribed "major tranquillizers" and was placed on a 30-minute monitoring schedule.

These documents also reveal that Nelson informed prison authorities about the smuggling of drugs and other impermissible items by other inmates, that he requested to be isolated from these inmates, and that he once testified falsely against an inmate, resulting in that inmate's conviction. Nelson's convictions in Montgomery County for passing forged instruments (August 1977 and April 1979) and perjury (August 1981) were also among the materials provided. The indictment for the perjury charge states that Nelson falsely swore that a man shot him, which resulted in the man being arrested and charged with attempted murder.

In the present case, the materiality question is a close one. As a professional and ethical matter, the prosecution should have discovered this important background information about Nelson before calling him as a witness. This is particularly true regarding Nelson's prior convictions for forgery and perjury, which were obtained by *the very same prosecutor's office* as was trying Brooks's case. Moreover, Nelson gave inaccurate testimony at trial concerning the extent of his prior criminal history, which the prosecution failed to correct. This was a serious professional failing.

Nevertheless, the *Brady* standard for materiality is less demanding than the ethical obligations imposed on a prosecutor. *See Cone v. Bell*, 129 S. Ct. 1769, 1783 n.15 (2009) ("Although the Due Process Clause of the Fourteenth Amendment, as interpreted by *Brady*, only mandates the disclosure of material evidence, the obligation to disclose evidence favorable to the defense may arise more broadly under a prosecutor's ethical or statutory obligations."). As previously explained, under *Brady*, we look to the undisclosed evidence as a whole to determine whether there is a reasonable probability that, had this evidence been disclosed to the defense, the result of the proceeding would have been different. *Kyles*, 514 U.S. at 433-34. Evidence that is "merely cumulative" to evidence presented at trial is "not material for purposes of *Brady* analysis." *Carter v. Mitchell*, 443 F.3d 517, 533 n.7 (6th Cir. 2006).

At trial, both the prosecution and the defense introduced evidence that impeached Nelson's credibility. The prosecution elicited testimony from Nelson about his convictions for larceny from a person, grand larceny, and jail escape. Nelson admitted that he first went to prison when he was 18-years old and had spent about 10 years in prison. During cross-examination, Nelson also testified that he had been convicted for "breach of trust." He further admitted that he had "gathered information and helped out the authorities . . . several times in prison." Nelson in fact acknowledged that he had testified as a jailhouse informant in at least one other criminal case. And he stated that he considered himself a "professional snitch" who received special privileges in prison for his assistance.

In his closing argument, Brooks's trial counsel vigorously attacked the credibility of Nelson as a witness, arguing that this "professional snitch" was dishonest and had ulterior motives for testifying. He emphasized the testimony of Lieutenant Tackett, who had known Nelson for fifteen years. As counsel argued:

> Can we understand why a high-ranking official with the Montgomery County Sheriff's Department may be a little reluctant to testify for a Defense Attorney? Yes. A Defense Attorney, probably not something they are in the habit of doing[.] But when he gets on the stand and he gets under oath, he tells you what his opinion is[.] He wouldn't believe anything Mr. Nelson tells him.

The jury therefore heard evidence that Nelson was a "professional snitch," that he received benefits from snitching, that he had an extensive criminal history, and that he was unworthy of belief. This impeaching evidence was highlighted for the jury by defense counsel in his closing argument. As the district court recognized, if *no* impeachment evidence had been disclosed concerning Nelson, this lack of impeachment would certainly have been material. *See Joseph v. Coyle*, 469 F.3d 441, 472 (6th Cir. 2006) ("We have little trouble assuming that, if all five items [of impeachment evidence] had been completely undisclosed, they certainly would have been material/prejudicial under *Brady*."). But here substantial evidence impeaching Nelson's credibility was disclosed and presented at trial.

The Supreme Court "has long recognized the serious questions of credibility informers pose." *Banks v. Dretke*, 540 U.S. 668, 701 (2004) (citation and internal quotation marks omitted). This court has similarly concluded that an informant-witness is sufficiently impeached, rendering the undisclosed impeachment materials nonmaterial, where "[t]he jury was apprised of [the informant's] status and the possible other reasons for his decision to testify, namely, that he wished to secure early parole as a result of his participation in the [defendant's] case." *Bell v. Bell*, 512 F.3d 223, 237 (6th Cir. 2008) (en banc).

As was the case in *Bell v. Bell*, the disclosure of the additional Nelson impeachment materials in the present case "would not have permitted the development of alternate theories or different lines of argument." *See id.* Nelson's credibility was effectively impeached at trial. Evidence of his history of mental illness would have provided additional reasons not to credit his testimony, but would have been cumulative to the evidence already in the record. Moreover, under Tennessee evidentiary law, Nelson's convictions for perjury and forgery were presumptively inadmissible due to the fact that they were over 15-years old at the time of Brooks's August 1996 trial. *See* Tenn. R. Evid. 609(b). We therefore conclude that, although this issue is uncomfortably close to the constitutional line, the undisclosed evidence was not material under *Brady*.

**E.        Presentation of and failure to correct the false testimony of Agent Phillips**

The second claim raised by Brooks on appeal is that the prosecution knowingly presented, and failed to correct, the false testimony of Agent Phillips concerning the fingerprint evidence discovered on the two beer cans found at the scene of Wisniewski's homicide. Brooks asserts that "procedural default is not an issue here since Brooks did in fact raise his fingerprints/false-testimony claim in the state trial and appellate courts, and because the prosecution obstructed those claims by presenting misrepresentations to the trial court and the postconviction court about the fingerprints." The State responds that this claim was not in fact "fairly presented to the state courts" because the fingerprint evidence was previously presented in the context of an ineffective-assistance-

of-counsel claim rather than a false-testimony claim, "and hence is barred by procedural default." "At any rate," argues the State, "it is entirely meritless."

The Supreme Court has long recognized that due process is denied where "[the] state has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured." *Mooney v. Holohan*, 294 U.S. 103, 112 (1935). Such conduct by the prosecution is "inconsistent with the rudimentary demands of justice." *Id.* The same holds true "when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue v. Illinois*, 360 U.S. 264, 269 (1959). As the Court explained in *United States v. Agurs*, 427 U.S. 97, 103-04 (1976), a false-testimony claim falls under the *Brady* disclosure doctrine. The contours of this claim were predominantly shaped by two Supreme Court cases: *Napue v. Illinois*, 360 U.S. at 269-72, and *Giglio v. United States*, 405 U.S. 150, 153-54 (1972).

This court has developed a three-part test for determining if the prosecution has committed a *Brady-Napue-Giglio* violation:

> The knowing use of false or perjured testimony constitutes a denial of due process if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. In order to establish prosecutorial misconduct or denial of due process, the defendants must show (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false. The burden is on the defendants to show that the testimony was actually perjured, and mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony.

*Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998) (quoting *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989)). A false statement is material under this standard, and "[a] new trial is required[,] if the false testimony could in any reasonable likelihood have affected the judgment of the jury." *Giglio*, 405 U.S. at 154 (alterations and internal quotation marks omitted) (quoting *Napue*, 360 U.S. at 271).

In the present case, Brooks argues that Agent Phillips falsely testified that both beer cans recovered at the scene of Wisniewski's homicide bore Brooks's fingerprints, when in fact the TBI lab reports show that Brooks's palm print was found on only one of the cans. The prosecution did not correct this inaccurate testimony, and Brooks's trial counsel declined to cross-examine Agent Phillips. (Brooks has not pursued an ineffective-assistance-of-counsel claim on appeal.)

The inaccuracy of Agent Phillips's testimony was demonstrated by materials presented at the state postconviction hearing. During that hearing, Brooks's counsel entered into evidence the investigative file of Detective Charvis, the lead investigator in the Wisniewski homicide case. The records contained in this file indicate that three beer cans were recovered and submitted to Agent Phillips for latent fingerprint examination. Two of these beer cans were recovered from Barge Point Road, where Wisniewski's body was found, and were labeled exhibits 40037890 and 40037891 in Agent Phillips's January 1995 report. The third beer can was recovered at the home of Brooks's girlfriend, Connie Gonzalez, and was labeled exhibit 50023469 in Agent Phillips's August 1995 report. Brooks's palm print was found on one of the beer cans from Barge Point Road, exhibit 40037891. Lunceford's prints were found on the beer can from Gonzalez's house, exhibit 50023469. An identifiable but unmatched print was discovered on the second beer can from Barge Point Road, exhibit 40037890. There is no report in the record, however, indicating that Brooks's prints were discovered on this second beer can. (The TBI reports were not entered into evidence at trial.)

During oral argument before this court, the State reiterated the argument made in its brief that "[t]here is no evidence . . . that the lab reports that Brooks presented at the evidentiary hearing represent all the reports that were generated by the Tennessee Bureau of Investigation." The State appears to be suggesting that Agent Phillips could have created another report that was not included in the lead investigator's file but that revealed Brooks's fingerprint on the second Barge Point Road beer can, exhibit 40037890. Perhaps recognizing that this argument was at best speculative and disingenuous, the State eventually conceded during oral argument that Agent Phillips's

trial testimony was mistaken. The State argued, however, that his testimony was not intentionally false and, in any event, was not material.

We find the State's materiality argument persuasive. Even Brooks does not contest the fact that his palm print was found on one of the two beer cans discovered at the scene of the Wisniewski homicide, which implicates Brooks in the crime. Thus, Agent Phillip's inaccurate testimony—that Brooks's prints were found on both beer cans found at the scene of the homicide instead of only one—could not "in any reasonable likelihood have affected the judgment of the jury." *See Giglio*, 405 U.S. at 154 (quoting *Napue*, 360 U.S. at 271).

Brooks tries to get around this inevitable conclusion by arguing that "the false testimony was material because the fact of the identifiable yet unmatched fingerprints on the second Barge Point can was powerful and objective exculpatory evidence." But no evidence concerning the unmatched print was elicited at trial, and Agent Phillips did not testify that *only* Brooks's prints were discovered on the two Barge Point Road beer cans. He was asked if, after comparing the latent fingerprints recovered from the beer cans with Brooks's fingerprints, he had an opinion concerning a possible match. His failure to further opine about other fingerprints found on the beer cans does not amount to false testimony. Brooks is thus unable to demonstrate that Agent Phillips testified falsely concerning the identifiable but unmatched fingerprint on the second Barge Point Road beer can.

Moreover, both the prosecution and the defense apparently had access to the TBI reports during trial, and therefore both parties were in equal positions to clarify Agent Phillips's testimony. *See Norris v. Schotten*, 146 F.3d 314, 334-35 (6th Cir. 1998) (concluding that there is no *Brady* violation where the defense had in its possession evidence that demonstrated the witness's inconsistent statements, and remarking that "there would be no need for a jury if trials did not contain such inconsistencies"). Brooks has neither argued nor provided any evidence that the prosecution withheld Agent Phillips's TBI reports from the defense. And because Brooks has not

demonstrated that Agent Phillips's inaccurate testimony was material under the *Brady-Napue-Giglio* standard, he is not entitled to relief on this claim.

We do not reach Brooks's further argument that the identifiable but unmatched print on the second Barge Point Road beer can potentially implicates Richard Roberts, also known as Boston Rick, as the real killer. Brooks has not pursued in this court an ineffective-assistance-of-counsel claim concerning this evidence. Nor does Brooks argue that the State's presentation of witnesses who further compounded the inaccuracy of Agent Phillips's trial testimony during the state postconviction hearing and the federal habeas evidentiary hearing constitutes an independent due process claim.

**F.     Nelson's recantation testimony**

Brooks's final claim on appeal appears to be a catch-all argument concerning prosecutorial misconduct that goes well beyond the issues certified for appeal. In addition, Brooks attempts to argue the cumulative effect of the alleged errors by the prosecution, which is also not an issue certified for appeal. Thus, distilled to the claims that have been properly certified, Brooks in his final claim addresses (1) whether the prosecution knowingly presented the perjured testimony of Nelson, and (2) whether the prosecution recruited Nelson as an informant in violation of Brooks's Sixth Amendment right to counsel. He argues that the district court clearly erred in crediting the testimony of the state prosecutors and discrediting the testimony of Nelson at the federal evidentiary hearing.

The State responds by asserting that any claims arising out of Nelson's recanting of his trial testimony are procedurally defaulted. It contends that, "[h]ad [Nelson's] testimony been false, Brooks plainly had notice of that fact at the time it was uttered," and therefore Brooks is unable to demonstrate cause for the default. In addition, the State argues that Brooks cannot demonstrate prejudice because the district court correctly determined that Nelson's testimony at the federal evidentiary hearing was not credible.

The Supreme Court, in *Massiah v. United States*, 377 U.S. 201 (1964), held that a criminal defendant is denied the Sixth Amendment right to counsel where the prosecution "use[s] against him at his trial evidence of his own incriminating words, which federal agents . . . deliberately elicited from him after he had been indicted and in the absence of his counsel." *Id.* at 206. This rule applies where the government recruits an undercover jailhouse informant, or otherwise "intentionally creat[es] a situation likely to induce [a defendant] to make incriminating statements without the assistance of counsel." *United States v. Henry*, 447 U.S. 264, 269, 274 (1980).

Because Brooks's claims that the prosecution recruited Nelson as a State informant and knowingly presented his false testimony at trial depend wholly on Nelson's testimony, Brooks's argument hinges on the credibility of Nelson as a witness at the federal habeas proceedings. But the district court discredited Nelson's testimony, and this court views with great suspicion the recantation testimony of trial witnesses in postconviction proceedings. *E.g.*, *Carter v. Mitchell*, 443 F.3d 517, 539 (6th Cir. 2006).

Brooks presents a plausible explanation for the placement of Nelson in Brooks's cell, the failure of the State to disclose Nelson's convictions for perjury and forgery, and the State's failure to disclose Nelson's history of mental illness; i.e., that the State engaged in knowing and deliberate prosecutorial misconduct in violation of Brooks's constitutional rights. This is not, however, the "only reasonable explanation," as Brooks claims. The district court's conclusion is also reasonable, where the court found that, "[g]iven [Nelson's] mental history, his prior convictions and reputation for untruthfulness, his inconsistent testimony about his role in these matters, and the testimony of the state prosecutors, . . . [Nelson's] testimony about the state prosecutors is not credible."

We review the district court's credibility determination under the highly deferential clear-error standard. *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985). There "can virtually never be clear error" where the "trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic

evidence," and where that finding is "not internally inconsistent." *Id.* at 575. Brooks presents on appeal an alternative, plausible explanation for Nelson's testimony. But he has failed to demonstrate that the district court's rejection of Nelson's story is contradicted by extrinsic evidence or is internally inconsistent. *See id.* And because the merits of Brooks's claim depend entirely on the credibility of Nelson's testimony, a rejection of that credibility necessitates a finding that Brooks has not shown prosecutorial misconduct.

## G.    Final admonition

Despite the fact that Brooks has not presented a claim to this court entitling him to habeas relief, we have grave concerns about how the State handled Brooks's trial, postconviction, and habeas proceedings. The State turned what should have been a strong, fairly clear-cut case into one raising serious constitutional questions. It presented inaccurate testimony to the trial court, the state postconviction court, and the district court concerning the fingerprint evidence discovered on the Barge Point Road beer cans. The State also conducted an inadequate investigation into Nelson's criminal and mental-health background, causing it to elicit inaccurate testimony at trial concerning the extent of Nelson's criminal history. We strongly admonish the State that such conduct does not meet the high standards of ethics and professionalism expected in a criminal prosecution.

## III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.

---

**CONCURRING IN THE JUDGMENT**

---

MARTHA CRAIG DAUGHTREY, Circuit Judge, concurring in the judgment. A separate concurring opinion that agrees only with the result reached by a majority of one's colleagues is a judicial construct both unusual and, generally, unwelcome. I would not so burden the resolution of this appeal if I were not concerned about the majority's imprecise application of the standards of review in this case, caused – it would appear – by a tendency to engage in an unnecessarily elaborate re-examination of the evidence from both the original jury trial and the evidentiary hearing in the district court.

As the majority recounts at great length, Donald Eugene Brooks was convicted of murder in the death of Joseph J. Wisniewski, who was found with his throat slit at the side of Barge Point Road in Clarksville, Tennessee, in October 1994. What the majority also notes, but fails to emphasize appropriately, is that following the jury verdict in state court finding Brooks guilty of aggravated murder and three related offenses, the *only* issue he raised on direct appeal was the legal sufficiency of the convicting evidence. The Tennessee Court of Criminal Appeals reviewed the trial testimony witness by witness, examining at length that of the state's chief witness, Edwin Lunceford, the accomplice who had been with defendant Brooks for much of the day of Wisniewski's murder. The state court's opinion set out Lunceford's testimony in detail, along with the testimony of various other prosecution witnesses who were called by the state for the purpose of corroborating Lunceford's narrative. The jury also heard tape-recordings of Lunceford's conversations with Brooks, made without Brooks's knowledge after Lunceford came forward voluntarily and confessed his part in the offense to police. Although the recordings do not contain an outright confession by Brooks, the statements were clearly incriminating. *See State v. Brooks*, No. 01C01-9703-CC-00099, 1998 WL 299267, at **1-3 (Tenn. Crim. App. June 9, 1998).

The appellate court's opinion also summarized the testimony of Mike Nelson, who was Brooks's cellmate and who plays a prominent role in the majority opinion in

this appeal.  In that summary, the court commented on Nelson's impeachment, noting that "Nelson admitted convictions of larceny from a person, grand larceny and escape," *id.* at *4, n.7, and actually conceded on cross-examination that he was a "professional snitch."  In addition, one of the law enforcement officers involved in the investigation of the murder charge against Brooks testified that "he had known Michael Nelson for about fifteen years and did not believe him to be truthful."

With Nelson's testimony thus fatally damaged, if not destroyed, Brooks's principal line of defense at trial consisted of an effort to demolish Lunceford's credibility, but to no avail.  As the Court of Criminal Appeals observed:

> [T]he record reflects that defense counsel ably and vigorously cross-examined Lunceford and assailed his credibility through other witnesses. Additionally, the state's evidence at trial supported its theory of the defendant's guilt of each of the four crimes of which he was ultimately convicted, although the defendant brought forward some evidence of an alibi. Thus, the jury had before it evidence which would allow it, on one hand, to convict the defendant, or on the other, to acquit him. The decision was one which *hinged on the jury's assessment of the credibility of the witnesses, particularly Edwin Lunceford*, and the weight and value which should be afforded the evidence. The decision was wholly one for the jury to make as trier of fact. Unfortunately for the defendant, the jury's discharge of its function resulted in *accreditation of Lunceford's testimony* and weighing and evaluating the state's evidence over that brought forward by the defense. Clearly, a rational trier of fact, such as the jury at the defendant's trial, could find the defendant guilty beyond a reasonable doubt of each of the four crimes on the evidence presented.

*Id.* at *6 (emphasis added).

Because Brooks was found guilty by a jury, we are constrained to apply what has been described as a "double layer of deference" in our review of the district court's denial of habeas relief.  *See White v. Steele*, 602 F.3d 707, 710 (6th Cir. 2009), *cert. denied*, __S.Ct. __, 2010 WL 2102202, 79 USLW 3198 (U.S. Oct. 4, 2010) (No. 09-10999).  In reviewing the legal sufficiency of the convicting evidence on direct appeal, the Tennessee Court of Criminal Appeals was required by *Jackson v. Virginia*, 443 U.S. 307 (1979), to "view[ ] the evidence in the light most favorable to the prosecution" and

affirm if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (emphasis in original). At this first level – deference to the jury's verdict – the *Jackson* standard is so demanding that "[a] defendant who challenges the sufficiency of the evidence to sustain his conviction faces a 'nearly insurmountable hurdle.'" *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009) (citation omitted). Moreover, "under *Jackson*, the assessment of the credibility of witnesses is generally beyond the scope of [habeas] review." *Schlup v. Delo*, 513 U.S. 298, 330 (1995). Added to this already heavy burden are the limitations of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996), which serve to create a second level of deference. Those standards permit us to overturn a state court's decision only if that court failed to apply the correct constitutional precedent or when the court's application of precedent was "objectively unreasonable" and not merely "incorrect or erroneous." *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003).

The import of this double level of deference is significant in this case. The Tennessee Court of Criminal Appeals found that Brooks's conviction withstood his challenge to the legal sufficiency of the evidence, based on the extensive testimony of Edwin Lunceford, which the court credited. That testimony clearly established the essential elements of each of the statutory offenses for which Brooks was convicted, based on factual determinations that are presumptively correct. *See Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009) ("[E]ven were we to conclude that a rational trier of fact could *not* have found a petitioner guilty beyond a reasonable doubt, on habeas review, we must still defer to the *state appellate court's* sufficiency determination as long as it is not unreasonable."), *cert. denied*, 130 S.Ct. 1081 (2010). Although it is true, as the petitioner now argues, that the legal questions controlled by *Brady v. Maryland*, 373 U.S. 83 (1963), must be reviewed *de novo* because there is no prior state-court ruling on those issues, *see Dyer v. Bowlen*, 465 F.3d 280, 284 (6th Cir. 2006), they must also be seen in context, *i.e.*, whether the *Brady* violations did anything to undermine Lunceford's testimony and the evidence introduced to corroborate that testimony. As the district court noted, the evidence of Brooks's guilt, as established by the record and

accredited by the jury, was overwhelming. Put simply, it is immaterial that Nelson may have been schizophrenic and that his testimony about Brooks's jail cell confession was therefore suspect. The majority's labored exposition of the historical facts is likewise immaterial.

Moreover, in this case we actually have a third level of deference, because the district court heard new testimony offered by Brooks in connection with his constitutional claims, found that it was not credible and, therefore, not material, and held that it could not serve as the basis for the issuance of a writ of habeas corpus. That credibility determination is, of course, not subject to review on appeal. *See United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993) ("In addressing sufficiency of the evidence questions, this Court has long recognized that we do not weigh the evidence, consider the credibility of witnesses or substitute our judgment for that of the [fact-finder].") (citing *United States v. Evans*, 883 F.2d 496, 501 (6th Cir. 1989)). Moreover, it is well-established that:

> If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

*Anderon v. City of Bessemer City, N.C.*, 470 U.S. 564, 573-74 (1985). As a result, the record wholly fails to establish that Nelson perjured himself at the state trial, or that members of the prosecutors' office solicited false testimony from Nelson.

The district court also found that the additional, undisclosed evidence about Nelson's background was insufficient to establish prejudice because the jury was fully aware of Nelson's reputation as a "professional snitch," his status as a convicted felon, and his lack of credibility in the eyes of law enforcement, all leading to his impeachment by defense counsel at Brooks's trial. Nor does the speculation about the ephemeral "Boston Rick" or the presence or absence of his fingerprints rise to the level of proof.

That, in my judgment, should be the end of our review of Brooks's habeas petition. Put bluntly, I do not think it serves any purpose to engage in elaborate parsing of the facts, as the majority has done in this case, because it suggests to lawyers and potential habeas litigants that we are re-weighing the evidence in the record *de facto* if not *de jure.* Thus, I would hold simply that the evidence credited by the jury established Brooks's guilt and that the district court did not err in refusing to grant habeas relief after determining that the evidence offered in support of Brooks's *Brady* claims was not creditable and was, therefore, insufficient to support the issuance of a writ.